## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

CORDIA COMMUNICATIONS CORP.,
et al.[1]

      Debtors.
_____/

Case Nos.: 6:11-bk-06493
through 6:11-bk-06497

Chapter 11

(Jointly Administered)

**DEBTORS' EXPEDITED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND SCHEDULING SALE OF COMPETITIVE LOCAL EXCHANGE CARRIER ("CLEC") ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (II) APPROVING BIDDING PROCEDURES AND STALKING HORSE PROTECTIONS; (III) APPROVING NOTICE OF SALE; (IV) SCHEDULING AUCTION TO CONSIDER QUALIFIED BIDS AND (V) SCHEDULING HEARING TO APPROVE ASSET PURCHASE AGREEMENT, AUCTION SALE RESULTS, AND SALE TO SUCCESSFUL BIDDER**

*Expedited Hearing Respectfully Requested on May 18, 2011 at 3:00 p.m.*

Cordia Communications Corp. ("CCC"), Cordia Communications Corp. of Virginia ("CCCVA"), My Tel Co., Inc. ("MTC"), Midwest Marketing Group, Inc. ("MMG"), and Northstar Telecom, Inc. ("NST"; NST, CCC, CCCVA, MTC and MMG being collectively referred to as the "Debtors"), by and through undersigned counsel, by and through undersigned counsel, pursuant to 11 U.S.C. §§ 105(a), 363(b), and 363(f) and Federal Rules of Bankruptcy Procedure 2002(a) and (c), 6004 and 9014, hereby request entry of an Order (i) Authorizing and Scheduling Sale of Competitive Local Exchange Carrier Assets Free and Clear of Liens, Claims and Encumbrances; (ii) Approving Bidding Procedures and Stalking Horse Protections; (iii)

---

[1] The last four digits of the taxpayer identification number for each of the jointly administered debtors are: Cordia Communications Corp. [1591], Cordia Communications Corp. of VA [6448], My Tel Co., Inc. [5042], Midwest Marketing Group, Inc. [5042], and Northstar Telecom, Inc. [9662]. The mailing address for the Debtors is 13275 W. Colonial Drive, Winter Garden, FL 34787.

Approving Notice of Sale; (iv) Scheduling Auction to Consider Qualified Bids and (v) Scheduling Hearing to Approve Asset Purchase Agreement, Auction Sale Results, and Sale to Successful Bidder (the "<u>Motion</u>").  In support thereof, the Debtors respectfully represent as follows:

**<u>PRELIMINARY STATEMENT</u>**

By this Motion, the Debtors respectfully request the Court's approval of an auction sale process for the competitive local exchange carrier ("<u>CLEC</u>") assets of CCC, CCCVA, MTC, and NST, as more fully described below.  The Debtors, with the assistance of their investment banker, Source Capital ("<u>Source</u>"), marketed the Assets (as defined herein) prior to the commencement of these cases and will continue to market the Assets upon approval of the Bidding Procedures presented herein (the "<u>Bidding Procedures</u>").

Based on the results of the extensive marketing efforts and after consideration of the significant risks to the Debtors' businesses associated with further delaying a sale process, the Debtors have determined that commencing a sale process immediately is in the best interests of the Debtors, their estates, and their creditors.  Indeed, the Debtors' and Source each believe a longer marketing window than that proposed herein will be unlikely to generate additional interest in the Assets.

As previously announced to the Court, the Debtors signed a Letter of Intent with a prospective purchaser with the expectation that such prospective purchaser would become the stalking horse bidder for the Assets.  The Debtors have been unable, however, to reach a definitive agreement with such prospective purchaser to date.  The Debtors are hopeful that they will yet reach closure with such prospective purchaser, however, the Debtors nevertheless believe that commencing a sale process immediately is the best course of action under the

circumstances and, by this Motion, seek authority to do so. In addition, the Debtors also seek advance authority to designate a stalking horse bidder and offer stalking horse protections, including a break-up fee and minimum overbid.

The Debtors perceive significant risks associated with delaying the commencement of a sale process, including potential disruption of service to their approximately 56,000 CLEC customers. Althouth the Debtors have, subject to Bankruptcy Court approval, reached agreements with three of their ILEC providers to prevent disconnection of service, these agreements are expressly linked to a sale process and the achievement by the Debtors of certain milestones in furtherance of a sale. Moreover, the Debtors have thus far been able to obtain consensual use of cash collateral based, at least in part, on the expectation that the Debtors will undertake a prompt sale process.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this Motion pursuant to 28 U S.C. § 1334(b) and 157(b)(1).

2.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

3.    Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## BACKGROUND

**A.    Procedural and Historical Background.**

4.    On May 1, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. The Debtors have retained Joseph Luzinski and Development Specialists, Inc. ("DSI") to serve as the Debtors Chief

Restructuring Officer.

5.    CCC, CCCVA, NST, and MTC (collectively, the "CLEC Debtors") provide telecommunications services as a competitive local exchange carrier or CLEC. As such, the CLEC Debtors offers small businesses and residential consumers bundled services that include local dial tone, unlimited domestic long distance, and unlimited feature plans by leasing a portion of the network owned by other telecommunications carriers. These leasing arrangements are controlled by multi-state, multi-year interconnection and commercial services agreements that allow the CLEC Debtors to offer telecommunications services to consumers without incurring the capital expenditures associated with building its own network. Certain of the CLEC Debtors have commercial services agreements with both incumbent local exchange carriers or ILECs, including Verizon and Qwest, and non-incumbent carriers.

6.    CCC currently holds licenses to operate in twenty-seven (27) states throughout the contiguous United States; CCCVA holds a license to operate in the Commonwealth of Virginia; MTC is licensed to offer local and long distance services in nine (9) states and has customers in seven (7) of those states; and, NST currently holds licenses to operate in thirteen (13) states and provides services in twelve (12) of those states. The CLEC Debtors currently have approximately 56,000 customer accounts (the "CLEC Customers").

7.    MMG was created to operate as an outbound telemarketing center. In 2009, MMG discontinued operations when such services were outsourced to an offshore telemarketing affiliate.

8.    The Debtors commenced the Chapter 11 Cases in order to facilitate a sale of their assets as a going concern (the "Sale"), which is in the best interests of their customers, creditors, and employees. The Sale is necessary to relieve the Debtors' core business

assets of pre-petition obligations which the Debtors are unable to repay other than through the proceeds of the Sale. The timing of the commencement of the Chapter 11 Cases was principally dictated by the deadline unilaterally imposed by Verizon---the CLEC Debtors' most substantial ILEC provider---for, (a) the suspension of its acceptance and processing of the CLEC Debtors' new and pending service orders to add or change service, and (b) to terminate service to the CLEC Debtors. Such actions by Verizon, if not stayed, would have resulted in the interruption of service to the CLEC Customers and prevented consummation of a Sale.

## THE DEBTORS' MARKETING EFFORTS
## AND THE PROPOSED AUCTION

9.     Source, the Debtors' proposed investment banker, was engaged by the Debtors prior to the commencement of these cases to both raise capital for the Debtors and to market the Assets. Specifically, from 2007 through April 2011, Source contacted more than 100 potential financing sources and potential purchasers. These contacts resulted in numerous discussions and meetings with various interested parties. Based upon the results of these extensive marketing efforts, the Debtors have concluded that it would be in the best interests of the Estates and the Debtors' creditors to now proceed with the sale of the Assets through a competitive auction process.

10.     Although the Debtors propose to proceed to an auction sale without having reached a definitive agreement with a potential purchaser, the Debtors seek advance authority to offer stalking horse protections such as a break-up fee and overbid protection to an appropriate purchaser in the event that such purchaser and the Debtors are able to reach a definitive agreement providing for payment of an acceptable purchase price, a suitable deposit, and the proposed purchaser demonstrates the financial ability to close. Advance Court authority with respect to these stalking horse protections is likely the only way the Debtors would be able to

timely finalize a Stalking Horse Bid, should they choose to do so.

**Assets to be Sold Pursuant to Proposed Bidding Procedures**

11.     The Debtors seek to sell all of their right, title, and interest in the following assets

(the "Assets") pursuant to the bidding procedures proposed herein:

> (i) all or substantially all of the tangible and intangible assets relating to the competitive local exchange carrier ("CLEC") operations of CCC, including without limitation, all hardware, software, customer contracts, intellectual property rights, call-center operations in the U.S. and technical and regulatory licenses used in connection with the CLEC operations of CCC (collectively, the "CCC Assets"),

> (ii) all or substantially all of the tangible and intangible assets relating to the CLEC operations of My Tel Co, including without limitation, all hardware, software, customer contracts, intellectual property rights, call-center operations in U.S. and technical and regulatory licenses used in connection with the CLEC operations of My Tel Co (collectively, the "My Tel Co Assets"),

> (iii) all or substantially all of the tangible and intangible assets relating to the CLEC operations of Northstar, including without limitation, all hardware, software, customer contracts, intellectual property rights, call-center operations in U.S. and technical and regulatory licenses used in connection with the CLEC operations of Northstar (collectively, the "Northstar Assets"), and

> (iv) all or substantially all of the tangible and intangible assets relating to the CLEC operations of CCC Virginia, including without limitation, all hardware, software, customer contracts, intellectual property rights, call-center operations in the U.S. and technical and regulatory licenses used in connection with the CLEC operations of CCC Virginia (collectively, the "CCC Virginia Assets," and together with the CCC Assets, the My Tel Co Assets and the Northstar Assets, the "Purchased Assets").

## THE BIDDING PROCEDURES

**A.     The Proposed Bidding Procedures Are in the Best Interest of the Estates, Creditors and Other Interested Parties**

12.     The Debtors seek approval of the bidding procedures attached hereto as Exhibit

"A" (including the dates, deadlines, notice provisions, etc. set forth therein) as the procedures

most likely to maximize the realizable value of the Assets for the benefit of the Debtors' estates,

their creditors and other interested parties.

13.     The proposed Bidding Procedures contemplate a sale process culminating in an

auction of the Assets approximately 60 days from entry of an order approving the Debtor's proposed sale process. Pursuant to the Bidding Procedures, any potential bidder may gain access to a data room and conduct due diligence in respect of the Assets to be sold upon having furnished the Debtors with, among other things, a confidentiality agreement, certain financial information demonstrating an ability to bid, and information disclosing the connections of such potential bidder to the Debtors, their insiders, their creditors, and their ownership.

14.     Potential bidders shall be allowed to perform due diligence through the Bid Deadline of July 27, 2011, at which time potential bidders must submit binding and irrevocable bids including, among other things, a deposit of not less than $250,000. To the extent competing Qualified Bids are submitted, an auction will be held on August 1, 2011 in anticipation of a sale hearing to be set by the Court shortly thereafter.

15.     As indicated above, the Bidding Procedures provide for the Debtors to enter into a definitive agreement with a potential purchaser and designate such purchaser as a stalking horse bidder on or before July 20, 2011 and to offer such stalking horse bidder with a break up fee no greater than 2.5% of the amount of net amount of the initial Stalking Horse Bid. If the Debtors designate a stalking horse bidder, any competing Qualified Bid must exceed the Stalking Horse Bid by the amount of the Break Up Fee plus $100,000.

16.     The Debtors submit that the Bidding Procedures provide ample time to identify the universe of potential purchasers and for such potential purchasers to conduct appropriate due diligence prior to submitting a binding bid. By providing sufficient time for marketing and diligence, the proposed Bidding Procedures are designed to maximize the value of the assets for the benefit of the Debtors and their creditors.

**B.     Legal Standard for Approval of Bidding Procedures**

17.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

18.     It is common for a debtor's assets to be offered for sale pursuant to an auction process. *See, e.g.*, *In re Dorado Marine, Inc.*, 332 B.R. 637, 639 (Bankr. M.D. Fla. 2005) (describing the auction sale of assets of manufacturer of custom boats); *In re Gulf States Steel, Inc. of Al.*, 285 B.R. 497, 503-04 (Bankr. N.D. Ala. 2002) (discussing and approving auction of assets of steel manufacturer). Additionally, a court may approve bidding procedures pursuant to Section 105(a) of the Bankruptcy Code, which authorizes a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a).

19.     The Bidding Procedures are designed to encourage as many potential buyers as possible to submit bids and to facilitate a fair and robust auction process if sufficient interest in the Assets is indicated by the Qualified Bids received. Any interested party may submit a bid for the Assets provided that they submit a Deposit, demonstrate an ability, financial and otherwise, to close, are willing to execute, prior to bidding, an asset purchase agreement in form and substance acceptable to the Debtors and otherwise comply with the Bidding Procedures. The proposed Bidding Procedures are not onerous or restrictive requirements and will ideally generate competitive bidding among potential purchasers.

### B.     Notice of Bidding Procedures and Sale Hearing

20.     Federal Rule of Bankruptcy Procedure 6004(a) provides that notice of a proposed sale of property, other than in the ordinary course of business, shall be given pursuant to Federal Rule of Bankruptcy Procedure 2002(a)(2) and (c). *In re Performance Materials, Inc.*, 309 B.R. 819, 823 (Bankr. M.D. Fla. 2004).

21.     Federal Rule of Bankruptcy Procedure 2002(a)(2) provides that not less than twenty (20) days' notice by mail shall be given of a proposed sale of property other than in the ordinary course of business unless the Court, for cause shown, shortens the time or directs another method of giving notice.  Federal Rule of Bankruptcy Procedure 2002(c)(1) governs the contents of the notice of a proposed sale and requires that the notice include, *inter alia*, the time and place of any sale and a general description of the property to be sold.  The Debtors request that the Court approve the form of the Bidding Procedures attached as Exhibit "A" as meeting the requirements of Federal Rule of Bankruptcy Procedure 2002(c)(1) and approve same as the Bidding Procedures Notice to be served (the "Bidding Procedures Notice")

22.     The Debtors propose to serve the Bidding Procedures Notice, which provides the time and place of the proposed Auction (if one is held), a summary of the Bidding Procedures and the terms and conditions of the proposed sale, via First Class U.S. Mail, within three (3) business days of approval of the Bidding Procedures, upon the following parties:

(i) all parties who have previously expressed to the Debtors an interest in acquiring all or any portion of the Purchased Assets;

(ii) the United States Trustee;

(iii) counsel to the Official Committee of Unsecured Creditors, if any, or any other official committee appointed by the Bankruptcy Court in these cases; and

(iv) all parties on the Local Rule 1007(d) Parties in Interest List.

23.     Accordingly, the Debtors request that the Court find that the Bidding Procedures Notice constitutes good and sufficient notice to creditors and parties in interest, and that no further notice of the Bidding Procedures, Sale Hearing, or Auction is required.

**C.      Legal Standards for Sale of Assets**

24.     Section 363(b)(1) states that the "trustee, after notice and a hearing, may use, sell,

or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts usually defer to the business judgment of a trustee/debtor-in-possession in deciding whether or not to authorize the trustee to sell property outside the ordinary course of business. *See, e.g.*, *In re Lorraine Brooke Associates, Inc.*, 07-12641-AJC, 2007 WL 2257608, at *4 (Bankr. S.D. Fla. Aug. 2, 2007) (*citing In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005) ("[g]reat judicial deference is given to the Trustee's exercise of business judgment"); *see also In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). In considering whether a debtor-in-possession is justified in selling assets outside the ordinary course of business, courts consider four factors: (a) whether a sound business reason or emergency justifies a pre-confirmation sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale has been proposed in good faith; and (d) whether the purchase price is fair and reasonable. *See In re Gulf States Steel, Inc. of Al.,* 285 B.R. at 514.

25.     Sound business reasons exist for selling the Assets and for doing so at this time. As stated above, the Debtors have engaged and will continue to engage in extensive marketing efforts in an attempt to locate a suitable purchaser for the Assets and to obtain the best value therefor. The Bidding Procedures provide for sufficient time for further marketing efforts and for potential purchasers to conduct appropriate due diligence.

26.     The Debtors have developed the Bidding Procedures, pursuant to which parties will have the ability to bid on the Assets. Consequently, by holding the Auction, the Debtors' believe that they will be able to seek and obtain a fair and reasonable market-price for the value of the Assets. Moreover, the Debtors do not believe putting off a sale process will lead to a better result.

27.     The sale of the Assets has been proposed in good faith and is within the Debtors' reasonable business judgment.  Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Debtors request that, upon the Closing, the Assets shall be transferred, sold, and delivered free and clear of all mortgages, security interests, conditional sale and/or title retention agreements, pledges, liens, judgments, demands, encumbrances, easements, restrictions, constructive or resulting trusts, or charges of any kind or nature, including, but not limited to, any restriction on the use, voting, transfer, receipt of income, or other exercise of any attributes of ownership (collectively, the "Liens") and all debts arising in any way in connection with any acts of the Debtors, claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, guarantees, options, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, arising prior to closing or relating to acts occurring prior to closing, and whether imposed by agreement, understanding, law or equity, or otherwise (collectively, the "Claims") with all such Liens and Claims to attach to the net proceeds of the sale of the Assets in the order of their priority, with the validity, force and effect that they now have, if any, against the Assets, subject to the rights, claims, defenses, and objections, if any of the Debtors and all interested parties with respect to such Liens and Claims.

28.     Pursuant to section 363(f) of the Bankruptcy Code, a trustee may sell property under 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions are satisfied: (i) applicable nonbankruptcy law permits the sale of such property free and clear of such interest; (ii) such entity consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest.

29.     To the extent any entity asserts an interest over the Purchased Assets and does not consent to the proposed sale, the Debtors believe that they can establish one or more of the above-listed requirements with respect to any such interest. Accordingly, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Included Assets should be sold free and clear of all Liens and Claims, with all such Liens and Claims to be satisfied solely out of the excess proceeds of the sale.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of an order (i) authorizing and scheduling a sale of the Assets free and clear of liens, claims and encumbrances; (ii) approving Bidding Procedures and stalking horse protections; (iii) approving the Bidding Procedures Notice; (iv) scheduling an auction sale to consider Qualified Bids; and (v) scheduling a sale hearing to approve the asset purchase agreement executed by the prevailing bidder, the auction sale results and the sale to the prevailing bidder.

Dated:  May 12, 2011.

Respectfully submitted,

**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
*Proposed Counsel for the Debtors*
1450 Brickell Avenue, Suite 200
Miami, FL 33131
Telephone: (305) 374-7580
Facsimile: (305) 375-7593

By: /s/   Scott L. Baena
    Scott L. Baena
    Fla. Bar No. 186445
    sbaena@bilzin.com
    Jason Z. Jones
    Fla. Bar No. 186554
    jjones@bilzin.com
    Jeffrey I. Snyder
    Florida Bar No. 21281

jsnyder@bilzin.com

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | **Case Nos.: 6:11-bk-06493** |
| | **through 6:11-bk-06497** |
| **CORDIA COMMUNICATIONS CORP.,** | |
| **et al.[1]** | **Chapter 11** |
| | |
| **Debtors.** | **(Jointly Administered)** |
| _____/ | |

**BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
COMPETITIVE LOCAL EXCHANGE CARRIER ("CLEC") ASSETS FREE AND
CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES**

By a motion dated May ___, 2011 (as modified, amended, or supplemented, the "Motion") (ECF No. ____) (the "Motion"), Cordia Communications Corp., a Nevada corporation ("CCC"), Cordia Communications Corp. of Virginia, a Virginia corporation ("CCC Virginia"), My Tel Co., Inc., a New York corporation ("My Tel Co"), Midwest Marketing Group, Inc., a Nebraska corporation ("MMG"), and Northstar Telecom, Inc., a Nebraska corporation ("Northstar"), as debtors and debtors in possession (collectively, the "Debtors") sought, among other things, approval of the procedures for the sale of substantially all of the Purchased Assets (as defined below). On May ___, 2011, the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") entered its order (the "Sale Procedures Order"), authorizing the Debtors to market the Purchased Assets that they own through the bidding procedures described below (the "Bidding Procedures"). As part of the Bidding Procedures, the Bankruptcy Court has scheduled a hearing to consider approval of the sale of the Purchased Assets to the Successful Bidder (as defined below), to be conducted on _____, 2011, at __:__ _.m. Eastern Time, at the Bankruptcy Court, 135 W. Central Boulevard, Courtroom B, 5th Floor, Orlando, Florida 32801 (the "Sale Hearing").

**I.**    **Notice of the Bid Procedures**. Within three business days after entry of the Sale Procedures Order, the Debtors will cause a copy of the Bidding Procedures Notice (as defined in the Motion) to be served upon (i) all parties who have previously expressed to the Debtors an interest in acquiring all or any portion of the Purchased Assets; (ii) the United States Trustee; (iii) counsel to the Official Committee of Unsecured Creditors, if any, or any other official

---

[1] The last four digits of the taxpayer identification number for each of the jointly administered debtors are: Cordia Communications Corp. [1591], Cordia Communications Corp. of VA [6448], My Tel Co., Inc. [5042], Midwest Marketing Group, Inc. [5042], and Northstar Telecom, Inc. [9662]. The mailing address for the Debtors is 13275 W. Colonial Drive, Winter Garden, FL 34787.

10322507/V-3

committee appointed by the Bankruptcy Court in these cases; and (iv) all parties on the Local Rule 1007(d) Parties in Interest List.

**II.**     **Assets to Be Sold.**     The Debtors seek to sell all of their right, title, and interest in the following assets:

    (i) all or substantially all of the tangible and intangible assets relating to the competitive local exchange carrier ("CLEC") operations of CCC, including without limitation, all hardware, software, customer contracts, intellectual property rights, call-center operations in the U.S. and technical and regulatory licenses used in connection with the CLEC operations of CCC (collectively, the "CCC Assets"),

    (ii) all or substantially all of the tangible and intangible assets relating to the CLEC operations of My Tel Co, including without limitation, all hardware, software, customer contracts, intellectual property rights, call-center operations in U.S. and technical and regulatory licenses used in connection with the CLEC operations of My Tel Co (collectively, the "My Tel Co Assets"),

    (iii) all or substantially all of the tangible and intangible assets relating to the CLEC operations of Northstar, including without limitation, all hardware, software, customer contracts, intellectual property rights, call-center operations in U.S. and technical and regulatory licenses used in connection with the CLEC operations of Northstar (collectively, the "Northstar Assets"), and

    (iv) all or substantially all of the tangible and intangible assets relating to the CLEC operations of CCC Virginia, including without limitation, all hardware, software, customer contracts, intellectual property rights, call-center operations in the U.S. and technical and regulatory licenses used in connection with the CLEC operations of CCC Virginia (collectively, the "CCC Virginia Assets," and together with the CCC Assets, the My Tel Co Assets and the Northstar Assets, the "Purchased Assets").

**III.**     **Designation of Stalking Horse Bid and Stalking Horse Protections**

A.     Designation of Stalking Horse.     Although the Debtors are not yet in a position to designate a potential purchaser as a stalking horse bidder, the Debtors may designate a stalking horse bidder on or before the fifth (5th) business day prior to the Bid Deadline in the event that the Debtors and a potential purchaser reach a definitive agreement that is acceptable to the Debtors (the "Stalking Horse Agreement"), and the potential purchaser is otherwise a Potential Bidder and has posted the Deposit (the "Stalking Horse Bidder"). The Debtors may designate a Stalking Horse Bidder by (i) notifying all other Potential Bidders of such designation, the identify of the Stalking Horse Bidder, the amount of the Stalking Horse Bidder's Bid (the "Stalking Horse Bid") and the resulting Minimum Bid; (ii) furnishing a copy of the Stalking Horse Agreement to all Potential Bidders, and (iii) filing with the Bankruptcy Court a "Notice of Designation of Stalking Horse Bidder" containing such designation, the identity of the Stalking Horse Bidder, the amount of the Stalking Horse Bid, and the resulting Minimum Bid. For the avoidance of doubt, the Stalking Horse Bid shall be deemed a Qualified Bid hereunder and the Stalking Horse Bidder shall be considered a Qualified Bidder.

B. <u>Stalking Horse Protections and Overbid Requirement</u>.  In the event the Debtors designate a Stalking Horse Bidder, and in consideration of the Stalking Horse Bidder's undertaking of the substantial legal, accounting and other expenses attendant to due diligence, the negotiation of a Stalking Horse Agreement with the Debtors, proceeding toward the consummation of the transaction, and acting as the Stalking Horse Bidder, the Debtors shall be authorized (but not required) to agree to a payment to the Stalking Horse Bidder of a fee in the amount not to exceed 2.5% of the net amount of the initial Stalking Horse Bid at closing from the proceeds of sale (the "<u>Break Up Fee</u>"), in the event that the Stalking Horse Bidder is not the Successful Bidder (defined below) to cover the Stalking Horse Bidder's reasonable out-of-pocket expenses and as an inducement to become the Stalking Horse Bidder.  The actual amount of the Break Up Fee, if any, shall be set forth in any Stalking Horse Agreement between the Debtors and the Stalking Horse Bidder, provided, however, that the provision providing for the payment of the Break Up Fee shall not be subject to further Bankruptcy Court approval and shall survive termination of any agreement between the Debtors and the Stalking Horse Bidder upon sale of the Purchased Assets to the Successful Bidder, if such Successful Bidder is not the Stalking Horse Bidder.

## IV. <u>Important Dates for Potential Bidders</u>

These Bidding Procedures provide an opportunity for interested parties to qualify and participate in the Auction and submit competing bids for the Purchased Assets.  In connection with these Bidding Procedures:

(a) The Debtors shall assist Potential Bidders (as defined below) in conducting their respective due diligence investigations and accept Bids (as defined below) until 5:00 p.m., Eastern Time, on July 27, 2011;

(b) To the extent that either (i) more than one Qualified Bid is received, or (ii) if the Debtors have designated a Stalking Horse Bidder and at least one Qualified Bid is received in addition to the Stalking Horse Bid, the Debtors shall conduct an auction (the "<u>Auction</u>") among Qualified Bidders (as defined below) on August 1, 2011 to identify the Successful Bid (as defined below); and

(c) The Debtors shall seek authority to sell all or substantially all of the Purchased Assets to the Successful Bidder at the Sale Hearing to be conducted by the Bankruptcy Court on _____, 2011 [First Week of August].

## V. <u>The Bidding Process</u>

The Debtors shall: (a) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Purchased Assets; (b) determine whether any person or entity is a Qualified Bidder; (c) receive and evaluate Bids from Qualified Bidders; and (d) administer the Auction.

Any person or entity who wishes to participate in the bidding process and the Auction must meet the participation requirements for Potential Bidders below and must thereafter submit a Qualified Bid to become a Qualified Bidder.  Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information

of any kind whatsoever relating to the Purchased Assets to any person or entity who does not comply with the participation requirements below.

## VI.   Participation Requirements

To participate in the bidding process and the Auction, each interested person or entity (a "Potential Bidder") must deliver the following documents to the parties described below (the "Participation Materials"):

(a)   an executed confidentiality agreement in form and substance satisfactory to the Debtors;

(b)   a statement demonstrating to the Debtors' satisfaction a bona fide interest in purchasing the Purchased Assets;

(c)   written evidence of sufficient funds, a commitment for financing or ability otherwise to consummate a sale transaction that includes the purchase from the Debtors of the Purchased Assets, such as a current audited financial statement and copies of the Potential Bidder's bank account statements showing available cash;

(d)   A letter setting forth the identity of the Potential Bidder, the contact information for such Potential Bidder and full disclosure of any pre-petition or post-petition connections that the Potential Bidder has or may have with (i) any of the Debtors, (ii) any of the Debtors' affiliates, (iii) any creditor of any of the Debtors, (iv) any holder of equity securities of or an ownership interest in any of the Debtors, and/or (v) any of the Debtors' current or former officers, directors or other insiders; and

(e)   An executed letter acknowledging receipt of a copy of the Bidding Procedures and agreeing to accept and be bound by the provisions contained herein.

The Participation Materials must be transmitted by the Potential Bidder to counsel to the Debtors, Bilzin Sumberg Baena Price & Axelrod LLP, 1450 Brickell Avenue, 23rd Floor, Miami, Florida 33131, Attn:  Scott L. Baena, Esq. (sbaena@bilzin.com).

If the Debtors determine that a Potential Bidder has a bona fide interest in the Purchased Assets, no later than two business days after the Debtors make that determination and have received from a Potential Bidder all of the materials required above, the Debtors will deliver to the Potential Bidder (a) an electronic copy of the form of Asset Purchase Agreement (the "Purchase Agreement") in MS Word format; and (b) access information for a confidential electronic data room concerning the Purchased Assets, which shall contain documents furnished by the Debtors to the Purchaser in connection with its due diligence in connection with the Purchase Agreement (the "Data Room").

## VII.   Due Diligence

Until the Bid Deadline, the Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the

Debtors, in their judgment, determine to be reasonable and appropriate under the circumstances. If the Debtors determine that due diligence material requested by a Potential Bidder is reasonable and appropriate under the circumstances, but such material has not previously been provided to any other Potential Bidder, the Debtors shall post such materials in the Data Room and provide email notice of such posting to all Potential Bidders as well as provide such materials to the Stalking Horse Bidder, if applicable.

Unless otherwise determined by the Debtors, availability of additional due diligence to a Potential Bidder will cease on the Bid Deadline. Except as provided above with respect to the copy of the Purchase Agreement provided by the Debtors to the Potential Bidders, and information in the Data Room, neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any party.

## VIII. <u>Bid Deadline</u>

A Potential Bidder that desires to make a bid on the Purchased Assets (a "<u>Bid</u>"), shall deliver written and electronic copies of its Bid so as to be received not later than 5:00 p.m., Eastern Time, on July 27, 2011 (the "<u>Bid Deadline</u>") by (a) counsel to the Debtors, Bilzin Sumberg Baena Price & Axelrod LLP, 1450 Brickell Avenue, 23rd Floor, Miami, Florida 33131, Attn: Scott L. Baena, Esq. (sbaena@bilzin.com), and (b) Source Capital Group, Inc., 1350 Brook Street, Suite H, St. Charles, Illinois 60174, Attn: Vik Grover, CFA (vgrover@sourcegrp.com).

## IX. <u>Bid Requirements</u>

A. To participate in the Auction, if any, a Potential Bidder must deliver by the Bid Deadline to the Debtors a written offer which must (i) be irrevocable prior to the closing of the sale of the Purchased Assets if the applicable Bidder is the Successful Bidder, and (ii) must provide or comply with each of the following to be deemed a "<u>Qualified Bid</u>" and for such Potential Bidder to be deemed a "<u>Qualified Bidder</u>":

(i) An executed asset purchase agreement (a "<u>Marked Agreement</u>") in substantially the same form as the Purchase Agreement pursuant to which the Potential Bidder offers to purchase the Purchased Assets from the Debtors. Such Marked Agreement shall not contain any conditions to closing based on the ability of the Bidder to obtain financing, the outcome of unperformed due diligence by the Bidder, internal approvals or consents, or any other conditions other than those set forth in the Purchase Agreement. The Bidder shall also provide a redlined copy of the Marked Agreement showing any changes to the Purchase Agreement, including changes to reflect the name of the potential bidder and the amount of such Potential Bidder's Bid;

(ii) The Bid must provide for a net purchase price in the form of cash or cash equivalents payable at closing in United States Dollars (the "<u>Purchase Price</u>"). If the Debtors designate a Stalking Horse Bidder, the Bid must be a higher or better offer as compared to the terms contained in the definitive agreement between the Debtors and the Stalking Horse Bidder. A Bid shall not be considered higher or better unless it provides for net consideration (on a risk-adjusted basis) to the Debtors' estates of at least $100,000 more than the aggregate consideration

contained in the Stalking Horse Bid, if any, less any adjustments set forth therein, plus the amount of the Break Up Fee (as defined in the Purchase Agreement) (such amount, the "Minimum Overbid Amount").  The Bid may not include any provision for a break-up or termination fee, or the equivalent;

(iii)    A deposit of not less than $250,000 (the "Deposit"), which shall be tendered by cashier's check and/or wire transfer into a segregated bank account established by the Debtors' counsel.  A Potential Bidder, including the Stalking Horse Bidder, if any, shall forfeit its Deposit if it is the Successful Bidder and (a) modifies or withdraws its Bid without the Debtors' consent before the consummation of the sale transaction with such Successful Bidder or (b) breaches the terms of the agreement pursuant to which the Successful Bidder has agreed to purchase the Purchased Assets.  A Potential Bidder's Deposit shall be returned (y) if such Potential Bidder is determined by the Debtors not to be a Qualified Bidder, promptly upon the making of such determination, or (z) if such Potential Bidder is not the Successful Bidder, promptly after the conclusion of the Auction;

(iv)    Evidence, in addition to any materials previously provided pursuant to section VI hereof, satisfactory to the Debtors of the Potential Bidder's ability to perform its obligations under the Marked Agreement including without limitation (a) its financial ability to close the sale transaction described therein, (b) its ability to obtain all required licenses and regulatory approvals; and (c) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in its analysis of issues arising with respect to any aspect of the Bid;

(v)    A list of any executory contracts and unexpired leases that are to be assumed and/or assigned under such Bid and a demonstration of the Potential Bidder's ability, subject to the terms of the Marked Agreement, to provide adequate assurance of future performance under all such executory contracts or unexpired leases to be assumed and/or assigned;

(vi)    A copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable Bid and to execute the Marked Agreement on the terms proposed;

B.    As soon as reasonably practicable following the Bid Deadline but in no event later than 12:00 noon Eastern time on July 29, 2011, the Debtors shall distribute a copy of each Bid, if any, that the Debtors have determined are Qualified Bids and identify the Qualified Bid that the Debtors have determined is the highest or best (the "Starting Bid") by e-mail, hand delivery or overnight courier to (i) all Qualified Bidders; (ii) the United States Trustee; (iii) the Stalking Horse Bidder, if any; and (iv) counsel to the Official Committee of Unsecured Creditors, if any, or any other official committee appointed by the Bankruptcy Court in these cases.  Any disputes as to whether a Potential Bidder is a Qualified Bidder shall be resolved by the Bankruptcy Court prior to the Auction.

## X.    The Auction

To the extent that either (i) more than one Qualified Bid is received, or (ii) if the Debtors have designated a Stalking Horse Bidder and at least one Qualified Bid is received in addition to

the Stalking Horse Bid, the Debtors will hold an auction (the "Auction") on August 1, 2011, commencing at 10:00 a.m. Eastern Time at the offices of Bilzin Sumberg Baena Price & Axelrod LLP, 1450 Brickell Avenue, Suite 2300, Miami, Florida 33131. Bidding will start at the highest Qualified Bid and will continue with minimum bid increments of $100,000, subject to adjustment by the Debtors as they deem practical, in their sole discretion, during the course of the Auction. The Auction may be adjourned as the Debtors deem appropriate. Reasonable notice of such adjournment and the time and place for resumption of the Auction shall be given to all entities that submitted a Qualified Bid.

The Auction shall be conducted in accordance with the following procedures:

(a) Only the Debtors, representatives of the Official Committee of Unsecured Creditors, if any, the Stalking Horse Bidder, if any, and any other Qualified Bidder that has timely submitted a Qualified Bid, in each case along with their representatives, may attend the Auction.

(b) Each Qualified Bidder may be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale by the Debtors of the Purchased Assets.

(c) Each Qualified Bidder must have at least one individual representative with authority to bind such Qualified Bidder in attendance. Notwithstanding the foregoing, in the event a Qualified Bidder does not attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder in the Debtors' sole discretion.

(d) At the Auction, the Debtors may employ and announce additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids or the determination to accept a back up bid) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court or any other applicable court entered in connection herewith and (ii) disclosed to each Qualified Bidder at the Auction.

(e) Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent Bid or combination of Bids is submitted by a Qualified Bidder(s) that (i) improves upon such Qualified Bidder's or Qualified Bidders' immediately prior Qualified Bid (such Bid or combination of Bids, a "Subsequent Bid") and (ii) the Debtors determine that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid or combination of Bids that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

## XI. The Successful Bid

Immediately at the conclusion of the Auction, the Debtors shall (a) determine, consistent with the Bidding Procedures, which Bid constitutes the highest or best Bid (such Bid, the "<u>Successful Bid</u>") and (b) communicate to the Stalking Horse Bidder, if any, and the other Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid. If no Qualified Bids are received the auction shall be cancelled and no Successful Bid shall be designated unless the Debtors have designated a Stalking Horse Bidder hereunder in which case the Stalking Horse Bid shall be designated as the Successful Bid. The bidder making the Successful Bid is referred to as the "<u>Successful Bidder</u>." The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final subject to approval by the Bankruptcy Court.

The Debtors shall be entitled to the Deposit of any Successful Bidder in circumstances described in section IX(A)(iii) above, and in such circumstances, such Deposit shall be deemed forfeited by such defaulting Successful Bidder. The Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder as the case may be.

## XII.   <u>The Sale Hearing</u>

The Successful Bid will be presented to the Bankruptcy Court for approval at the Sale Hearing. At the Sale Hearing, the Debtors will seek entry of an order authorizing and approving the sale of the Purchased Assets to the Successful Bidder on the terms set forth in the Marked Agreement submitted by the Successful Bidder modified to reflect the terms of the Successful Bid including any changes to such terms agreed to at the Auction. To the extent applicable, the Debtors shall also request entry of an order providing for payment to any Stalking Horse Bidder of the Break Up Fee. The Sale Hearing may be adjourned or rescheduled by an announcement of such adjournment at the Sale Hearing and no other or further notice of such adjournment or rescheduling shall be required.

Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on all matters relating to the proposed sale, and parties shall be prepared to present their evidence in support of or in opposition to the proposed sale at the Sale Hearing; <u>provided</u>, however, that issues relating to the assumption and assignment of executory contracts and unexpired leases shall be addressed by separate motion.

## XIII.   <u>"As Is, Where Is"</u>

The sale transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or their estates, except to the extent expressly set forth in the Stalking Horse Agreement, if any, or the Marked Agreement corresponding to the Successful Bid, as the case may be. Except as otherwise provided in the Successful Bid, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), encumbrances, rights, remedies, restrictions, interests, liabilities, leasehold interests and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, including all rights or claims based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Purchased

Assets to the Successful Bidder, all as more specifically set forth and defined in the Sale Motion and the proposed order approving the sale transaction (as so defined therein, "Claims") as set forth in the Purchase Agreement and the Sale Order, with such Claims to attach to the net proceeds of the sale with the same validity and priority as such Claims applied against the Purchased Assets.

## XIV.  Bankruptcy Court Jurisdiction

Any and all disputes related or pertaining to or resulting or arising from the Bid Procedures, the Auction, the sale transaction, and/or the conduct of the Debtors, in connection therewith shall be adjudicated solely by the Bankruptcy Court.  The submission of a Bid or shall constitute an express consent by the Bidder to the exclusive jurisdiction of the Bankruptcy Court for all such matters.

MIAMI 2540848.2 7946635829