UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| **In re:** | Case Nos.: 6:11-bk-06493 through 6:11-bk-06497 |
| **CORDIA COMMUNICATIONS CORP., et al.**[1] | Chapter 11 |
| Debtors._____/ | (Jointly Administered) |

**ORDER AUTHORIZING AND SCHEDULING A SALE OF COMPETITIVE LOCAL EXCHANGE CARRIER ("CLEC") ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (II) APPROVING BIDDING PROCEDURES AND STALKING HORSE PROTECTIONS; (III) APPROVING NOTICE OF SALE; (IV) SCHEDULING AUCTION TO CONSIDER QUALIFIED BIDS AND (V) SCHEDULING HEARING TO APPROVE ASSET PURCHASE AGREEMENT, AUCTION SALE RESULTS, AND SALE TO SUCCESSFUL BIDDER**

This matter came before the Court on May 27, 2011 at 11:30 a.m. upon the Debtors' Expedited Motion for Entry of an Order (i) Authorizing and Scheduling Sale of Competitive Local Exchange Carrier Assets Free and Clear of Liens, Claims and Encumbrances; (ii) Approving Bidding Procedures and Stalking Horse Protections; (iii) Approving Notice of Sale; (iv) Scheduling Auction to Consider Qualified Bids and (v) Scheduling Hearing to Approve Asset Purchase Agreement, Auction Sale Results, and Sale to Successful Bidder [ECF No. 59] (the "Motion") and the Supplement to the Motion [ECF No. 96] (the "Supplement"). The Court, having reviewed the Motion, the record in these cases, the arguments of counsel, and being otherwise duly advised in the premises, finds that it has jurisdiction to consider the Motion as

---

[1] The last four digits of the taxpayer identification number for each of the jointly administered debtors are: Cordia Communications Corp. [1591], Cordia Communications Corp. of VA [6448], My Tel Co., Inc. [5042], Midwest Marketing Group, Inc. [5042], and Northstar Telecom, Inc. [9662]. The mailing address for the Debtors is 13275 W. Colonial Drive, Winter Garden, FL 34787.

supplemented by the Supplement, that good cause exists to grant the relief requested therein, that such relief constitutes a reasonable exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, and creditors, that appointment of a consumer privacy ombudsman is not required under section 332 of the Bankruptcy Code, and that, the Break Up Fee,[2] if triggered, is reasonable and appropriate and commensurate to the benefit conferred by the Stalking Horse Bidder upon the Debtors' estates. Accordingly, it is **ORDERED** that:

1. The Motion, as revised by the Supplement, is **GRANTED** to the extent set forth herein.

2. The Bidding Procedures, which are attached hereto as Exhibit A and incorporated herein by reference (the "Bidding Procedures"), are hereby approved in all respects and shall govern all bids and bid proceedings related to the Purchased Assets. The failure specifically to include or reference any particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

3. Any person wishing to submit a higher or better offer for the Purchased Assets must do so in accordance with the terms of the Bidding Procedures.

4. To the extent that at least one Qualified Bid is received in addition to the Stalking Horse Bid, the Debtors shall be, and hereby are, authorized to conduct an auction sale of the Purchased Assets pursuant to the Bidding Procedures.

5. The Break Up Fee, consisting of the reimbursement of the Stalking Horse Bidder for actual, reasonably incurred costs and expenses in an amount not to exceed $200,000, is

---

[2] All capitalized terms have the meaning ascribed to them in the Bidding Procedures annexed to the Supplement as Exhibit "A".

approved in all respects and shall be paid from the proceeds of the sale in the event that the Stalking Horse Bidder is not the Successful Bidder; provided, however, no Break Up Fee shall be payable in the event that on or before June 17, 2011, (a) the Purchase Agreement is not executed by the Stalking Horse Bidder and the Debtors, or (b) the Stalking Horse Bidder fails to post the Deposit.

6. Qualified Bids conforming to the Bidding Procedures shall be submitted in the manner provided in the Bidding Procedures on or before June 29, 2011 at 5:00 p.m. To the extent at least one Qualified Bid is received in addition to the Stalking Horse Bid, the Debtors will hold an auction (the "Auction") on July 1, 2011, commencing at 10:00 a.m. Eastern Time at the offices of Development Specialists, Inc. ("DSI"), Southeast Financial Center, 200 South Biscayne Boulevard, Suite 1818, Miami, Florida 33131, at which time the Debtors will determine the Successful Bid.

7. The Sale Hearing shall take place on July 14, 2011 at 11:00 a.m. at the United States Bankruptcy Court, 135 W. Central Boulevard, Courtroom B, 5th Floor, Orlando, Florida 32801, to consider approval of the sale of the Purchased Assets to the Successful Bidder, free and clear of all Liens and Claims (with such Liens and Claims to attach to the proceeds of sale in the same priority as existed with respect to the Purchased Assets immediately prior to the Closing) and authorizing and approving the Purchase Agreement or Marked Agreement of the Successful Bidder, as modified to reflect any changes agreed to at the Auction, and the transactions set forth therein.

8. Objections to the sale of the Purchased Assets to the Successful Bidder free and clear of liens and claims pursuant to Section 363(f) of the Bankruptcy Code, on the terms set forth in the Motion and in accordance with the Purchase Agreement or Marked Agreement of

the Successful Bidder, as well as objection to the assumption and assignment of any executory contracts or unexpired leases as provided for in the Purchase Agreement or the Marked Agreement of the Successful Bidder, as applicable, shall be filed with the Bankruptcy Court no later than July 8, 2011 at 5:00 p.m. ET.

9. The Debtors are authorized and directed to serve the Bidding Procedures annexed hereto as Exhibit A, which Bidding Procedures shall constitute adequate notice to satisfy the requirements of Federal Rule of Bankruptcy Procedure 2002(c)(1). The Debtors shall serve such notice via First Class U.S. Mail, within three (3) business days of approval of the Bidding Procedures, upon the following parties, which shall constitute good and sufficient notice and be deemed to satisfy the requirements of Federal Rules of Bankruptcy Procedure 2002(a) and 6004(a) and (c):

(i) all parties who have previously expressed to the Debtors or their investment banker an interest in acquiring the Purchased Assets;

(ii) the United States Trustee;

(iii) all parties on the Local Rule 1007(d) Parties in Interest List.

10. Notwithstanding the possible applicability of Bankruptcy Rules 6004, 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11. The Debtors are authorized and empowered to take such steps as may be necessary to implement and effect the terms and requirements established and relief granted in this Order.

12. The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

**DONE** and **ORDERED** in Orlando, Florida, on May 27, 2011.

                                             Karen S. Jennemann
                                             United States Bankruptcy Judge

Copies to:

Scott L. Baena, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, Suite 2300
Miami, FL 33131

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| **In re:** | **Case Nos.: 6:11-bk-06493** |
| | **through 6:11-bk-06497** |
| **CORDIA COMMUNICATIONS CORP.,** | |
| **et al.[3]** | **Chapter 11** |
| Debtors. | (Jointly Administered) |
| _____/ | |

**BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' COMPETITIVE LOCAL EXCHANGE CARRIER ("CLEC") ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES**

By a motion dated May 12, 2011 (as supplemented on May 25, 2011 [ECF No. 96], the "Motion") [ECF No. 59] (the "Motion"), Cordia Communications Corp., a Nevada corporation ("CCC"), Cordia Communications Corp. of Virginia, a Virginia corporation ("CCC Virginia"), My Tel Co., Inc., a New York corporation ("My Tel Co"), Midwest Marketing Group, Inc., a Nebraska corporation ("MMG"), and Northstar Telecom, Inc., a Nebraska corporation ("Northstar"), as debtors and debtors in possession (collectively, the "Debtors") sought, among other things, approval of the procedures for the sale of substantially all of the Purchased Assets (as defined below). On May 27, 2011, the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") entered its order (the "Sale Procedures Order"), authorizing the Debtors to market the Purchased Assets that they own through the bidding procedures described below (the "Bidding Procedures"). As part of the Bidding Procedures, the Bankruptcy Court has scheduled a hearing to consider approval of the sale of the Purchased Assets to the Successful Bidder (as defined below), to be conducted on July 14, 2011, at 11:00 a.m. Eastern Time, at the Bankruptcy Court, 135 W. Central Boulevard, Courtroom B, 5th Floor, Orlando, Florida 32801 (the "Sale Hearing").

**I.     Notice of the Bid Procedures**. Within three business days after entry of the Sale Procedures Order, the Debtors will cause a copy of the Bidding Procedures Notice (as defined in the Motion) to be served upon (i) all parties who have previously expressed to the Debtors an interest in acquiring all or any portion of the Purchased Assets; (ii) the United States Trustee;

---

[3] The last four digits of the taxpayer identification number for each of the jointly administered debtors are: Cordia Communications Corp. [1591], Cordia Communications Corp. of VA [6448], My Tel Co., Inc. [5042], Midwest Marketing Group, Inc. [5042], and Northstar Telecom, Inc. [9662]. The mailing address for the Debtors is 13275 W. Colonial Drive, Winter Garden, FL 34787.

(iii) counsel to the Official Committee of Unsecured Creditors, if any, or any other official committee appointed by the Bankruptcy Court in these cases; and (iv) all parties on the Local Rule 1007(d) Parties in Interest List.

**II.     Assets to Be Sold.**     The Debtors seek to sell all of their right, title, and interest in the following assets (the "Purchased Assets"):

(i)     all retail, wholesale, and long distance only customer / lines with service activated on the closing date (the "Active Lines");

(ii)    a list of all cancelled / non-activated business and residential customers / lines that have been terminated within the twelve (12) months prior to the closing date;

(iii)   all web domains, customer service telephone numbers and intellectual property rights used to support the Purchased Assets except for the BSS and OSS (as defined below);

(iv)    the Billing Support Systems ("BSS") and Operations Support Systems ("OSS") data related to the Purchased Assets with associated data definition and migration assistance;

(v)     the right, but not the obligation to seek to hire all support personnel currently supporting the Assets;

**III.    Stalking Horse Bid and Stalking Horse Protections**

A.    The Debtors have entered into a Term Sheet for the Acquisition of Assets of CCC, My Tel Co., and Northstar (the "Term Sheet") with Birch Communications, Inc. ("Birch" or the "Stalking Horse Bidder"), which contemplates, among other things, the sale of the Purchased Assets to Birch pursuant to the terms of a definitive Asset Purchase Agreement (the "Purchase Agreement") to be finalized and executed on or before June 17, 2011.  Pursuant to the Term Sheet, Birch will pay consideration of $8 million in cash (the "Stalking Horse Bid"), subject to adjustment based upon the actual number of Active Lines existing as of closing of the sale as more fully set forth in the Term Sheet.

B.    Break Up Fee. In consideration of Birch's undertaking of the substantial legal, accounting and other expenses attendant to due diligence, the negotiation of the Purchase Agreement with the Debtors, proceeding toward the consummation of the transaction, and acting as the Stalking Horse Bidder, the Debtors shall reimburse Birch for actual, reasonably incurred costs and expenses in an amount not to exceed $200,000, payable at closing from the proceeds of sale (the "Break Up Fee"), in the event that the Stalking Horse Bidder is not the Successful Bidder (defined below).  Notwithstanding the foregoing, in the event that on or before June 17, 2011, (a) the Purchase Agreement is not executed by Birch and the Debtors, or (b) Birch fails to post the Deposit, Birch shall not be entitled to any Break Up Fee hereunder.

**IV.    Important Dates for Potential Bidders**

These Bidding Procedures provide an opportunity for interested parties to qualify and participate in the Auction and submit competing bids for the Purchased Assets. In connection with these Bidding Procedures:

(a) The Debtors shall assist Potential Bidders (as defined below) in conducting their respective due diligence investigations and accept Bids (as defined below) until 5:00 p.m., Eastern Time, on June 29, 2011;

(b) The Debtors shall file the executed Purchase Agreement with the Bankruptcy Court so it is accessible via the Bankruptcy Court's PACER system on or before June 18, 2011;

(c) To the extent that at least one Qualified Bid is received in addition to the Stalking Horse Bid, the Debtors shall conduct an auction (the "Auction") among Qualified Bidders (as defined below) on July 1, 2011 to identify the Successful Bid (as defined below); and

(d) The Debtors shall seek authority to sell all or substantially all of the Purchased Assets to the Successful Bidder at the Sale Hearing to be conducted by the Bankruptcy Court on July 14, 2011.

## V. The Bidding Process

The Debtors shall: (a) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Purchased Assets; (b) determine whether any person or entity is a Qualified Bidder; (c) receive and evaluate Bids from Qualified Bidders; and (d) administer the Auction.

Any person or entity who wishes to participate in the bidding process and the Auction must meet the participation requirements for Potential Bidders below and must thereafter submit a Qualified Bid to become a Qualified Bidder. Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any person or entity who does not comply with the participation requirements below.

## VI. Participation Requirements

To participate in the bidding process and the Auction, each interested person or entity (a "Potential Bidder") must deliver the following documents to the parties described below (the "Participation Materials"):

(a) an executed confidentiality agreement in form and substance satisfactory to the Debtors;

(b) a statement demonstrating to the Debtors' satisfaction a bona fide interest in purchasing the Purchased Assets;

(c) written evidence of sufficient funds, a commitment for financing or ability otherwise to consummate a sale transaction that includes the purchase from the Debtors of the Purchased Assets, such as a current audited financial statement and copies of the Potential Bidder's bank account statements showing available cash;

(d) A letter setting forth the identity of the Potential Bidder, the contact information for such Potential Bidder and full disclosure of any pre-petition or post-petition connections that the Potential Bidder has or may have with (i) any of the Debtors, (ii) any of the Debtors' affiliates, (iii) any creditor of any of the Debtors, (iv) any holder of equity securities of or an ownership interest in any of the Debtors, and/or (v) any of the Debtors' current or former officers, directors or other insiders; and

(e) An executed letter acknowledging receipt of a copy of the Bidding Procedures and agreeing to accept and be bound by the provisions contained herein.

The Participation Materials must be transmitted by the Potential Bidder to counsel to the Debtors, Bilzin Sumberg Baena Price & Axelrod LLP, 1450 Brickell Avenue, 23rd Floor, Miami, Florida 33131, Attn: Scott L. Baena, Esq. (sbaena@bilzin.com).

If the Debtors determine that a Potential Bidder has a <u>bona fide</u> interest in the Purchased Assets, no later than two business days after the Debtors make that determination and have received from a Potential Bidder all of the materials required above, the Debtors will deliver to the Potential Bidder (a) an electronic copy of the Purchase Agreement in MS Word format; and (b) access information for a confidential electronic data room concerning the Purchased Assets, which shall contain documents furnished by the Debtors to the Stalking Horse Bidder in connection with its due diligence (the "Data Room").

## VII. Due Diligence

Until the Bid Deadline, the Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their judgment, determine to be reasonable and appropriate under the circumstances. If the Debtors determine that due diligence material requested by a Potential Bidder is reasonable and appropriate under the circumstances, but such material has not previously been provided to any other Potential Bidder, the Debtors shall post such materials in the Data Room and provide email notice of such posting to all Potential Bidders as well as provide such materials to the Stalking Horse Bidder.

Unless otherwise determined by the Debtors, availability of additional due diligence to a Potential Bidder will cease on the Bid Deadline. Except as provided above with respect to the copy of the Purchase Agreement provided by the Debtors to the Potential Bidders, and information in the Data Room, neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever relating to the Purchased Assets to any party.

## VIII. Bid Deadline

A Potential Bidder that desires to make a bid on the Purchased Assets (a "Bid"), shall deliver written and electronic copies of its Bid so as to be received not later than 5:00 p.m., Eastern Time, on June 29, 2011 (the "Bid Deadline") by (a) counsel to the Debtors, Bilzin Sumberg Baena Price & Axelrod LLP, 1450 Brickell Avenue, 23rd Floor, Miami, Florida 33131, Attn: Scott L. Baena, Esq. (sbaena@bilzin.com), and (b) Source Capital Group, Inc., 1350 Brook Street, Suite H, St. Charles, Illinois 60174, Attn: Vik Grover, CFA (vgrover@sourcegrp.com).

## IX. Bid Requirements

A. To participate in the Auction, if any, a Potential Bidder must deliver by the Bid Deadline to the Debtors a written offer which must (i) be irrevocable prior to the closing of the sale of the Purchased Assets if the applicable Bidder is the Successful Bidder, and (ii) must provide or comply with each of the following to be deemed a "Qualified Bid" and for such Potential Bidder to be deemed a "Qualified Bidder":

(i) An executed asset purchase agreement (a "Marked Agreement") in substantially the same form as the Purchase Agreement pursuant to which the Potential Bidder offers to purchase the Purchased Assets from the Debtors. Such Marked Agreement shall not contain any conditions to closing based on the ability of the Bidder to obtain financing, the outcome of unperformed due diligence by the Bidder, internal approvals or consents, or any other conditions other than those set forth in the Purchase Agreement. The Bidder shall also provide a redlined copy of the Marked Agreement showing any changes to the Purchase Agreement, including changes to reflect the name of the potential bidder and the amount of such Potential Bidder's Bid;

(ii) The Bid must provide for a net purchase price in the form of cash or cash equivalents payable at closing in United States Dollars (the "Purchase Price") and must be a higher or better offer as compared to the terms contained in the Purchase Agreement. A Bid shall not be considered higher or better unless it provides for net consideration (on a risk-adjusted basis) to the Debtors' estates of at least $300,000 more than the Stalking Horse Bid (such amount, the "Minimum Overbid Amount"). The Bid may not include any provision for a break-up or termination fee, or the equivalent;

(iii) A deposit of not less than $250,000 (the "Deposit"), which shall be tendered by cashier's check and/or wire transfer into a segregated bank account established by the Debtors' counsel. A Potential Bidder, including the Stalking Horse Bidder, shall forfeit its Deposit if it is the Successful Bidder and (a) modifies or withdraws its Bid without the Debtors' consent before the consummation of the sale transaction with such Successful Bidder or (b) breaches the terms of the agreement pursuant to which the Successful Bidder has agreed to purchase the Purchased Assets. A Potential Bidder's Deposit shall be returned (y) if such Potential Bidder is determined by the Debtors not to be a Qualified Bidder, promptly upon the making of such determination, or (z) if such Potential Bidder is not the Successful Bidder, promptly after the conclusion of the Auction;

(iv) Evidence, in addition to any materials previously provided pursuant to section VI hereof, satisfactory to the Debtors of the Potential Bidder's ability to perform its obligations

under the Marked Agreement including without limitation (a) its financial ability to close the sale transaction described therein, (b) its ability to obtain all required licenses and regulatory approvals; and (c) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in its analysis of issues arising with respect to any aspect of the Bid;

      (v)    A list of any executory contracts and unexpired leases that are to be assumed and/or assigned under such Bid and a demonstration of the Potential Bidder's ability, subject to the terms of the Marked Agreement, to provide adequate assurance of future performance under all such executory contracts or unexpired leases to be assumed and/or assigned;

      (vi)    A copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable Bid and to execute the Marked Agreement on the terms proposed;

  B.    As soon as reasonably practicable following the Bid Deadline but in no event later than 12:00 noon Eastern time on June 30, 2011, the Debtors shall distribute a copy of each Bid, if any, that the Debtors have determined are Qualified Bids and identify the Qualified Bid that the Debtors have determined is the highest or best (the "<u>Starting Bid</u>") by e-mail, hand delivery or overnight courier to (i) all Qualified Bidders; (ii) the United States Trustee; (iii) the Stalking Horse Bidder; (iv) Thermo Credit, LLC ("<u>Thermo</u>"); (v) counsel for Verizon, PAETEC, and Affinity Networks (the "<u>Carriers</u>") pursuant to stipulations between such carriers and the Debtors; (vi) counsel for the Universal Service Administrative Company; and (vii) counsel to the Official Committee of Unsecured Creditors, if any, or any other official committee appointed by the Bankruptcy Court in these cases. Any disputes as to whether a Potential Bidder is a Qualified Bidder shall be resolved by the Bankruptcy Court prior to the Auction.

## X.    <u>The Auction</u>

To the extent at least one Qualified Bid is received in addition to the Stalking Horse Bid, the Debtors will hold an auction (the "<u>Auction</u>") on July 1, 2011, commencing at 10:00 a.m. Eastern Time at the offices of Development Specialists, Inc. ("<u>DSI</u>"), Southeast Financial Center, 200 South Biscayne Boulevard, Suite 1818, Miami, Florida 33131. Bidding will start at the Starting Bid and will continue with minimum bid increments of $100,000, subject to adjustment by the Debtors as they deem practical, in their sole discretion, during the course of the Auction. The Auction may be adjourned as the Debtors deem appropriate. Reasonable notice of such adjournment and the time and place for resumption of the Auction shall be given to all entities that submitted a Qualified Bid.

The Auction shall be conducted in accordance with the following procedures:

      (a)    Only the Debtors, representatives of the Official Committee of Unsecured Creditors, if any, the Stalking Horse Bidder, Thermo, and any other Qualified Bidder that has timely submitted a Qualified Bid, in each case along with their representatives, may attend the Auction.

(b) Each Qualified Bidder may be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale by the Debtors of the Purchased Assets.

(c) Each Qualified Bidder must have at least one individual representative with authority to bind such Qualified Bidder in attendance. Notwithstanding the foregoing, in the event a Qualified Bidder does not attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder in the Debtors' sole discretion.

(d) At the Auction, the Debtors may employ and announce additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids or the determination to accept a back up bid) for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court or any other applicable court entered in connection herewith and (ii) disclosed to each Qualified Bidder at the Auction.

(e) Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent Bid or combination of Bids is submitted by a Qualified Bidder(s) that (i) improves upon such Qualified Bidder's or Qualified Bidders' immediately prior Qualified Bid (such Bid or combination of Bids, a "Subsequent Bid") and (ii) the Debtors determine that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid or combination of Bids that it believes to be the highest or otherwise better offer (the "Leading Bid") upon consultation with Thermo if it attends the Auction in person. A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

## XI. The Successful Bid

Immediately at the conclusion of the Auction, upon consultation with Thermo if it attends the Auction in person, the Debtors shall (a) determine, consistent with the Bidding Procedures, which Bid constitutes the highest or best Bid (such Bid, the "Successful Bid") and (b) communicate to the Stalking Horse Bidder and the other Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid. If no Qualified Bids are received the Auction shall be cancelled and the Stalking Horse Bid shall be designated as the Successful Bid. The bidder making the Successful Bid is referred to as the "Successful Bidder." The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final subject to approval by the Bankruptcy Court.

The Debtors shall cause to be filed with the Bankruptcy Court as soon as possible after the conclusion of the Auction, the Purchase Agreement or Marked Agreement of the Successful Bidder, as modified to reflect any changes agreed to at the Auction, together with a list of any executory contracts and unexpired leases that are to be assumed and/or assigned under such Successful Bid.

The Debtors shall be entitled to the Deposit of any Successful Bidder in circumstances described in section IX(A)(iii) above, and in such circumstances, such Deposit shall be deemed forfeited by such defaulting Successful Bidder as liquidated damages and the Debtors waive all rights to pursue any other remedies, legal or equitable, available to them.

**XII.   The Sale Hearing**

The Successful Bid will be presented to the Bankruptcy Court for approval at the Sale Hearing. At the Sale Hearing, the Debtors will seek entry of an order authorizing and approving the sale of the Purchased Assets to the Successful Bidder on the terms set forth in the Marked Agreement submitted by the Successful Bidder modified to reflect the terms of the Successful Bid including any changes to such terms agreed to at the Auction. To the extent applicable, the Debtors shall also request entry of an order providing for payment to any Stalking Horse Bidder of the Break Up Fee. The Sale Hearing may be adjourned or rescheduled by an announcement of such adjournment at the Sale Hearing and no other or further notice of such adjournment or rescheduling shall be required.

Any party opposing the proposed sale shall attempt in good faith to resolve such objections with the Debtors. Any objections to the sale must be filed with the Bankruptcy Court and served upon counsel to the Debtors before July 8, 2011 at 5:00 p.m. ET.

Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on all matters relating to the proposed sale, and parties shall be prepared to present their evidence in support of or in opposition to the proposed sale at the Sale Hearing; *provided*, *however*, that issues relating to the assumption and assignment of executory contracts and unexpired leases shall be addressed by separate motion.

**XIII.   "As Is, Where Is"**

The sale transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors, their agents or their estates, except to the extent expressly set forth in the Stalking Horse Agreement, if any, or the Marked Agreement corresponding to the Successful Bid, as the case may be. Except as otherwise provided in the Successful Bid, all of the Debtors' right, title and interest in and to the Purchased Assets shall be sold free and clear of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code), encumbrances, rights, remedies, restrictions, interests, liabilities, leasehold interests and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, including all rights or claims based on any successor or transferee liability, all environmental claims, all change in control provisions, all rights to object or consent to the effectiveness of the transfer of the Purchased Assets to the Successful Bidder, all as more specifically set forth and defined in the Sale Motion and the proposed order approving the sale transaction (as so defined therein, "Claims") as set forth in the Purchase Agreement and the Sale Order, with such Claims to attach to the net proceeds of the sale with the same validity and priority as such Claims applied against the Purchased Assets.

## XIV. <u>Bankruptcy Court Jurisdiction</u>

Any and all disputes related or pertaining to or resulting or arising from the Bid Procedures, the Auction, the sale transaction, and/or the conduct of the Debtors, in connection therewith shall be adjudicated solely by the Bankruptcy Court. The submission of a Bid or shall constitute an express consent by the Bidder to the exclusive jurisdiction of the Bankruptcy Court for all such matters.