## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION
### www.flmb.uscourts.gov

In re:                                              Case Nos.: 6:11-bk-06493
                                                    through 6:11-bk-06497
**CORDIA COMMUNICATIONS CORP.,**
**et al.**[1]                                       **Chapter 11**

            **Debtors.**                            **(Jointly Administered)**
_____/

## ORDER AUTHORIZING AND APPROVING (1) ASSET PURCHASE AGREEMENT, (2) SALE OF COMPETITIVE LOCAL EXCHANGE CARRIER ("CLEC") ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES TO BIRCH COMMUNICATIONS, INC. AND (3) CERTAIN RELATED RELIEF

This matter came before the Court on July 14, 2011 upon the Expedited Motion for Entry of an Order (I) Authorizing and Scheduling Sale of Competitive Local Exchange Carrier ("CLEC") Assets Free and Clear of Liens, Claims and Encumbrances; (II) Approving Bidding Procedures and Stalking Horse Protections; (III) Approving Notice of Sale; (IV) Scheduling Auction to Consider Qualified Bids and (V) Scheduling Hearing to Approve Asset Purchase Agreement, Auction Sale Results, and Sale to Successful Bidder [ECF No. 59] and the Supplement thereto [ECF No. 96] (together, the "Sale Motion")[2] filed by the Debtors.[3]

---

[1] The last four digits of the taxpayer identification number for each of the jointly administered debtors are: Cordia Communications Corp. [1591], Cordia Communications Corp. of VA [6448], My Tel Co., Inc. [5042], Midwest Marketing Group, Inc. [5042], and Northstar Telecom, Inc. [9662].  The mailing address for the Debtors is 13275 W. Colonial Drive, Winter Garden, FL 34787.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Sale Motion and the Purchase Agreement (as defined herein).

[3] The "Debtors" shall mean Cordia Communications Corp., Cordia Communications Corp. of Virigina, My Tel Co., Inc., Midwest Marketing Group, Inc. and Northstar Telecom, Inc.

On July 8, 2011, Thermo Credit, LLC ("Thermo") filed its Limited Objection to the Sale Motion (the "Thermo Objection").  Thermo also filed a Motion for Injunctive Relief in adversary proceeding 11-ap-00107 (the "Thermo Motion").  On July 8, 2011, the Universal Service Administrative Company ("USAC") filed its Limited Objection to the Sale Motion [ECF No. 161] (the "USAC Objection").  USAC also filed its Motion for Entry of an Order Allowing and Directing the Immediate Payment of Universal Service Fees Accrued and Accruing Post-Petition [ECF No. 163] (the "USAC Motion").

The Court, (a) having entered an order on May 27, 2011 [ECF No. 113] (the "Bidding Procedures Order") approving, among other things, the proposed bidding procedures (the "Bidding Procedures"), bid protections and notice of the Sale; (b) having been advised that no Qualified Bids having been submitted in accordance with the Bidding Procedures and that the Debtors cancelled the auction scheduled for July 1, 2011; (c) understanding that the Debtors have executed that certain Asset Purchase Agreement with Birch Communications, Inc. ("Buyer") that was filed of record with the Court on June 17, 2011 [ECF No. 144] (including all exhibits and attachments thereto, the "Purchase Agreement"); (d) having held a final hearing on the Sale Motion on July 14, 2011 (the "Sale Hearing"); (e) having determined that all interested parties have been afforded an opportunity to be heard with respect to the Sale Motion and all relief related thereto, and (f) having reviewed and considered (i) the Sale Motion, (ii) the Purchase Agreement, (iii) the arguments of counsel, (iv) the evidence proffered or adduced at the Sale Hearing, (v) the record in these chapter 11 cases, and (vi) that that all objections to the relief set forth herein have been withdrawn or otherwise resolved as set forth herein, does FIND, DETERMINE, and CONCLUDE as follows.

A.      The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue of these cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      Notwithstanding Federal Rules of Bankruptcy Procedure 6004(h), 7062 and 9014, the Court expressly finds that there is no reason for delay in the implementation of this Order and the closing of the Transactions (as hereinafter defined), and expressly directs judgment as set forth herein.

C.      The statutory predicates for the relief sought in the Sale Motion are sections 105(a), 363(b), (f) and (m), and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

D.      Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing, and the transactions contemplated by the Purchase Agreement and this Order (the "Transactions") has been provided in accordance with sections 105(a) and 363 of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Bankruptcy Rules and in compliance with the Bidding Procedures Order and the Bidding Procedures, such notice was good and sufficient, and appropriate under the particular circumstances, and no other or further notice of the Sale Motion, the Sale Hearing, or the Transactions is or shall be required.

E.      As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have marketed the Acquired Assets and conducted the sale process with respect thereto in compliance with the sale process and the Bidding Procedures previously approved by this Court.

F.      The Bidding Procedures provided full, fair and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets.  The Debtors and Buyer complied with the Bidding Procedures Order in all respects.

G.       No consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtors to consummate the Transactions.

H.      Approval of the Purchase Agreement and consummation of the Transactions at this time are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

I.       The Debtors have demonstrated good, sufficient, and sound business purpose and justification for the sale contemplated by this Order pursuant to section 363(b) of the Bankruptcy Code.

J.      A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities.

K.      The Purchase Agreement was negotiated, proposed and entered into by the Debtors and Buyer without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor Buyer have engaged in any conduct that would cause or permit the Purchase Agreement or any part of the Transactions to be avoided under section § 363(n) of the Bankruptcy Code.

L.      Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the Transactions.

M.      The consideration provided by Buyer for the Acquired Assets pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest or best offer for the Acquired

Assets and (iii) constitutes reasonably equivalent value and fair consideration for the Acquired Assets.

N.      The Purchase Agreement must be approved and consummated promptly in order to preserve the value of the Acquired Assets.

O.      The transfer of the Acquired Assets to Buyer will be a legal, valid, and effective transfer of such assets and will vest Buyer with all right, title, and interest of the Debtors to such assets free and clear of (i) all claims and interests, including, without limitation, any charge, lien, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, third party interest or other restriction or limitation of any kind (collectively, the "Encumbrances") and (ii) all debts arising under or out of, in connection with, or in any way relating to, any acts of the Debtors, claims (as defined in section 101(5) of the Bankruptcy Code), rights or causes of action (whether in law or in equity, including any rights or causes of action based on theories of transferee or successor liability under any law, statute or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), obligations, demands, guaranties, rights, contractual commitments, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of the Debtors' bankruptcy cases, and whether imposed by agreement, understanding, law, equity or otherwise.

P.      The Debtors may sell the Acquired Assets free and clear of all Encumbrances of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Those nondebtor parties with claims or interests in the Acquired Assets who did not object, or who withdrew their objections,

to the Purchase Agreement or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  To the extent that any nondebtor parties have not consented or been deemed to have consented, such nondebtor parties with claims or interests in the Acquired Assets fall within one or more of the other subsections of sections 363(f) of the Bankruptcy Code and are adequately protected by having their claims or interests, if any, attach to the cash proceeds of the Transactions ultimately attributable to the property against or in which they claim an interest.

Q.      Except for the obligations expressly assumed by Buyer in the Purchase Agreement (such assumed obligations, the "Assumed Liabilities"), the transfer of the Acquired Assets to Buyer will not subject Buyer to any liability whatsoever with respect to the operation of the Debtors' businesses (collectively, the "Business") prior to the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of antitrust, successor, or transferee liability.

R.      Buyer would not have entered into the Purchase Agreement, and would not consummate the Transactions contemplated thereby, if the sale of the Acquired Assets were not free and clear of all Encumbrances relating to the Acquired Assets, the operation of the Business prior to the closing of the Transactions or the transfer of the Acquired Assets, or if Buyer would, or in the future could, be liable for any such Encumbrances or any other liabilities (other than Assumed Liabilities) as described in the Purchase Agreement.

S.      The Debtors (i) have full corporate power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and the Transactions have been duly and validly authorized by all necessary corporate action of the Debtors, (ii) have all of the

corporate power and authority necessary to consummate the Transactions contemplated by the Purchase Agreement, (iii) have taken all actions necessary to authorize and approve the Purchase Agreement and the consummation by the Debtors of the Transactions contemplated thereby and (iv) have all consents and approvals, other than those expressly provided for in the Purchase Agreement, that are required for the Debtors to consummate such transactions.  The Acquired Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

Accordingly, it is therefore

ORDERED:

1.      The Sale Motion is **GRANTED** to the extent set forth herein.

2.      The findings of fact set forth above and conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.      All objections to the entry of this Order or the relief provided herein that have not been withdrawn, waived, or settled and that are not otherwise addressed herein, including all reservations of rights included therein, are hereby overruled on the merits.

4.      Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

5.      The sale of the Acquired Assets and the consideration provided by Buyer under the Purchase Agreement is fair and reasonable and shall be deemed for all purposes to constitute

a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

## Approval of the Purchase Agreement

6.      The Purchase Agreement, and all of the terms and conditions thereof, is hereby approved.

7.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and directed to consummate the Transactions pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

8.      The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate and implement the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement, and to take all further actions as may be requested by Buyer for the purpose of assigning, transferring, granting, conveying and conferring to Buyer or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement.

## Transfer of Acquired Assets

9.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Acquired Assets shall be transferred to Buyer, and upon consummation of the Transactions (the "Closing") shall be, free and clear of any Encumbrances, other than the Assumed Liabilities, with all such Encumbrances of any kind or nature whatsoever to attach to the proceeds from the sale remaining after the payment of allowed payments to the Debtors' providers and other amounts required to be paid in connection with the Closing, against or in which the holder of an Encumbrance may claim in the order of their priority, with the same validity, force and effect

8

which they now have, subject to any claims and defenses the Debtors may possess with respect thereto.

10.    Except as expressly permitted or otherwise specifically provided by the Purchase Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding Encumbrances of any kind or nature whatsoever against or in the Debtors or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the operation of the Business prior to the Closing Date, or the transfer of the Acquired Assets to Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting against Buyer, its successors or assigns, property, or assets, such persons' or entities' Encumbrances.

11.    The transfer of the Acquired Assets to Buyer pursuant to the Purchase Agreement constitutes a legal, valid, and effective transfer of such assets, and shall vest Buyer with all right, title, and interest of the Debtors in and to such assets free and clear of all Encumbrances of any kind or nature whatsoever.

12.    Any sales Tax, use Tax, personal property Tax or similar Tax attributable to the sale or transfer of the Acquired Assets shall be the responsibility of, and shall be paid by, the Debtors.

## Assumption and Assignment of Agreements with Verizon

13.    Notwithstanding anything else contained in this Order, only the terms set forth in this paragraph 13 shall govern the assumption and assignment of the existing executory contracts between the Debtors and the wholly owned subsidiaries of Verizon Communications Inc.

(collectively, "Verizon"),[4] including, without limitation, the Wholesale Advantage Services Agreement effective as of January 1, 2005, as amended (the "Cordia WASA") and the Interconnection Agreements for the states of Florida, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, Texas and Virginia (collectively, the "Cordia ICAs") (the Cordia WASA and the Cordia ICAs, collectively, the "Verizon Contracts"):

(a)     Upon receipt of the Verizon Cure (as defined below), and conditioned upon the Debtors' satisfaction of their obligations under sub-paragraph (c) below, the Verizon Contracts shall be deemed assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, and assigned to the Buyer as of the date of the Closing, or such earlier date as may be agreed upon among the Debtors, the Buyer and Verizon. Contemporaneously with such assumption and assignment, and by no later than the date thereof, the Debtors shall pay to Verizon, by wire transfer and pursuant to instructions to be provided by Verizon, the sum of Four Million Four Hundred Thousand Dollars ($4,400,000.00) (the "Verizon Cure"), which sum shall be deemed to cure all existing, pre-petition payment defaults under the Verizon Contracts.  Upon Verizon's receipt of the Verizon Cure, and except as otherwise provided in this paragraph 13, the Debtors and Verizon, on behalf of themselves and any persons or entities claiming through them, shall be deemed to have mutually released and forever discharged one another from any and all claims, debts, credits, demands or causes of action, known or unknown, at law or in equity, present or future, fixed or contingent, that accrued or arose at any time prior to the Petition Date in these cases, including, without limitation, any claims for charges or

---

[4]     For purposes of this Order, the definition of Verizon includes, without limitation, Verizon Services Corp., Verizon Business Network Services Inc., MCI Communications, Inc. d/b/a Verizon Business Services, and the local operating telephone company subsidiaries of Verizon Communications Inc.

credits associated with the provision of telecommunications services and facilities and any avoidance actions under Chapter 5 of the Bankruptcy Code.

(b)      From and after the date of assignment of the Verizon Contracts, the Buyer shall be responsible for all charges accruing for services and facilities provided by Verizon on and after the date of assignment.  For the avoidance of doubt, Buyer shall have no liability with respect to, and Verizon and Debtors expressly waive and release Buyer from, any claims, debts, credits, demands or causes of action, known or unknown, at law or in equity, present or future, fixed or contingent, that accrued or arose under the Verizon Contracts at any time prior to the assignment of the Verizon Contracts to Buyer; similarly, Buyer waives and releases Verizon from any claims, debts, credits, demands or causes of action, known or unknown, at law or in equity, present or future, fixed or contingent, that accrued or arose under the Verizon Contracts at any time prior to the assignment of the Verizon Contracts to Buyer.

(c)      Pending their assumption of the Verizon Contracts and assignment thereof to the Buyer, the Debtors shall remain current on their advance weekly payments to Verizon under the Stipulation Establishing Adequate Assurance of Payment to the Operating Telephone Company Subsidiaries of Verizon Communications Inc. (the "Stipulation") approved by the Court on May 26, 2011 [ECF No. 105], and shall otherwise continue to comply with all of their obligations under the Stipulation.

(d)      Upon its assumption and assignment to the Buyer, the Cordia WASA will be deemed terminated, at no charge or expense to the Buyer, and all services provided to the Debtors under the Cordia WASA as of the Closing will thereafter be provided to the Buyer under the Buyer's corresponding and existing Wholesale Advantage Services

Agreement with Verizon.  In the event that the Buyer wishes to terminate any of the Cordia ICAs after assignment by the Debtors and transfer the services provided thereunder to an existing agreement between the Buyer and Verizon, the Buyer shall provide written notice of such intent to Verizon (in care of William G. Cummings), and the Buyer may be required to submit appropriate Local Service Requests and/or Access Service Requests to Verizon in order to effectuate such transfer of services.  Conditioned upon the Debtors' satisfaction of their obligations under sub-paragraph (c) above, Verizon shall issue credits to the Buyer as may be necessary to offset any charges that may accrue, after assignment of the Verizon Contracts, in connection with the transfer to the Buyer's contracts with Verizon of the services provided by Verizon under the Verizon Contracts.

(e)    Within seventy-five (75) days after the Closing, Verizon shall provide to the Debtors a final true-up (the "Closing True-Up") covering charges incurred by the Debtors for services rendered by Verizon from the Petition Date or the date of the last true-up under the Stipulation (as the case may be) to and through the Closing (the "Post-Petition Payables").  Within ten (10) business days after Verizon provides the Debtors with the Closing True-Up, the Debtors shall pay any underpayment to Verizon or Verizon shall return any overpayment to the Debtors, as the case may be.  Nothing contained herein shall prohibit Verizon from terminating service prior to the Closing for non-payment of amounts owed by the Debtors to Verizon pursuant to the terms of the Stipulation.

(f)    The terms of this paragraph 13 constitute written confirmation by Verizon of the terms under which it will agree to assignment of the Verizon Contracts, and shall

satisfy the Debtor's obligation under paragraph 9.5 of the Asset Purchase Agreement to obtain Verizon's written consent.

**Assumption and Assignment of Agreements with Qwest**

14.     Notwithstanding anything else contained in this Order or the Asset Purchase Agreement, only the terms set forth in this paragraph 14 shall govern the assumption and assignment of certain existing executory contracts (with all amendments, annexes, exhibits, attachments and addenda, the "Qwest Contracts") between any of the Debtors and either of Qwest Corporation ("QC") or Qwest Communications Company, LLC ("QCC" and collectively with QC, the "Qwest Entities").  Specifically, the "Qwest Contracts" constitute any and all agreements (including, but not limited to, applicable tariffs) pursuant to which either of the Qwest Entities provide telecommunications and related products and services to any of the Debtors in the Required States (as defined in the Purchase Agreement):

(a)     Pursuant to section 365 of the Bankruptcy Code, conditioned upon receipt by the Qwest Entities of the Qwest Cure (as defined below) and conditioned upon the Debtors' satisfaction of their obligations under sub-paragraph (c) below, as of the date of upon which the sale to Buyer closes (the "Closing Date"), the Qwest Contracts shall be deemed assumed by the Debtors and assigned to the Buyer.  As a condition to such assumption and assignment, and by no later than the Closing Date, the Debtors shall pay to the Qwest Entities (pursuant to wire transfer instructions to be provided by the Qwest Entities to the Debtors) the sum of Forty-Eight Thousand, Four Hundred Ninety-Three Dollars and Sixteen Cents ($48,493.16) (the "Qwest Cure"), which sum shall be deemed

to cure all pre-petition payment defaults under the Qwest Contracts.[5]  Upon the Qwest Entities' receipt of the Qwest Cure, and except as otherwise provided in this paragraph 14, the Debtors, on behalf of themselves, their bankruptcy estates and any persons or entities claiming through them, and the Qwest Entities shall be deemed to have mutually released and forever discharged one another from any and all claims, debts, credits, demands or causes of action, known or unknown, at law or in equity, present or future, fixed or contingent, that accrued or arose at any time prior to the Petition Date in these cases, including, without limitation, any claims for charges or credits associated with the provision of telecommunications services and facilities, and any avoidance actions under Chapter 5 of the Bankruptcy Code.

(b)     The Buyer shall be liable for charges under any of the Qwest Contracts that accrue (i) on and after the Closing Date, and (ii) prior to the transfer of accounts and/or services provided under the Qwest Contracts by the Qwest Entities to existing agreements between the Buyer and the applicable Qwest Entities, as set forth in sub-paragraph (d).  In no event shall the Buyer be liable for charges accruing under the Qwest Contracts before the Closing Date.  For the avoidance of doubt, Buyer shall have no liability with respect to, and the Qwest Entities and the Debtors expressly waive and release Buyer from, any claims, debts, credits, demands or causes of action, known or unknown, at law or in equity, present or future, fixed or contingent, that accrued or arose under the Qwest Contracts at any time prior to the assignment of the Qwest Contracts to Buyer; similarly, Buyer waives and releases each of the Qwest Entities from any claims,

---

[5] The Qwest Cure, as set forth herein, is net of the prepetition deposit, plus accrued interest, provided by one or more of the Debtors to QC, which was applied by QC against the Debtors' prepetition arrears pursuant to the Qwest Stipulation (as defined below).

debts, credits, demands or causes of action, known or unknown, at law or in equity, present or future, fixed or contingent, that accrued or arose under the Qwest Contracts at any time prior to the assignment of the Qwest Contracts to Buyer.

(c)    The Debtors shall be liable for all obligations under any of the Qwest Contracts accruing prior to the Closing Date, regardless of when such obligations are due and payable.  Pending their assumption of the Qwest Contracts and assignment thereof to the Buyer, the Debtors also shall remain current on their payment obligations to the Qwest Entities under the Agreement Resolving Adversary Proceeding (the "Qwest Stipulation") approved by the Court on May 26, 2011 [ECF No. 112], and shall otherwise continue to comply with all of their obligations under the Qwest Stipulation and the Qwest Contracts.

(d)    After the assumption and assignment of the Qwest Contracts, the Qwest Entities shall transfer the accounts and/or services provided thereunder by the Qwest Entities to existing agreements between the Buyer and the applicable Qwest Entities, as further set forth in this sub-paragraph (d), and after the completion of such transfers, the Qwest Contracts shall be deemed terminated.  To effectuate such termination and transfer, the Buyer shall provide (i) to QC one local service request ("LSR") with an electronic list detailing the accounts to be transferred to the Buyer's agreements with QC and (ii) to QCC one letter of authority ("LOA") with an electronic list detailing the accounts to be transferred to the Buyer's agreements with QCC and the term of such services related to such accounts.[6]  Upon receipt of such LOA or LSR, as appropriate, and the accompanying electronic list of accounts, QC or QCC, as appropriate, shall open

---

[6] The Buyer has to re-term services furnished by QCC and transferred to Birch's agreements with QCC hereunder.

a special project for the purpose of preparing to transfer the accounts to the Birch contracts with QC or QCC, as appropriate, as soon as practicable in the ordinary course of business after the Closing Date.  The Qwest Entities shall not charge the Buyer for processing or effectuating the transfer pursuant to the LOA or LSR provided for herein. The Debtors and Buyer, as appropriate, also shall execute and submit to the Qwest Entities any documents necessary to effectuate the transition described in this sub-paragraph (d), including, but not limited to, the execution and submission of any necessary amendments, addenda, or service exhibits to the existing agreements between the Buyer and the applicable Qwest Entity.  Buyer's failure to pay any obligations under subparagraph (b) above shall constitute a default under the Qwest Contracts and the existing agreements between the Buyer and the Qwest Entities.  Notwithstanding the other provisions of this Order, if Buyer fails to submit the LOA or LSR (and the accompanying electronic account lists) duly authorized written requests described in this sub-paragraph within thirty (30) days of the Closing, the Qwest Entities shall be entitled to terminate the services provided under the Qwest Contracts.

(e)     Within seventy-five (75) days after the Closing Date, the Qwest Entities shall provide to the Debtors a final true-up (the "Qwest Closing True-Up") covering charges incurred by the Debtors for telecommunications and related products and services rendered by the Qwest Entities from and including the Petition Date through the Closing Date.  Within ten (10) business days after the Qwest Entities provide the Debtors with the Qwest Closing True-Up, the Debtors shall pay any underpayment to the Qwest Entities (or the Qwest Entities shall return any overpayment to the Debtors, as the case

may be).[7]   Nothing contained in this Order or the Asset Purchase Agreement shall prohibit the Qwest Entities from terminating service prior to or on the Closing Date for non-payment of amounts owed by any of the Debtors to the Qwest Entities pursuant to the terms of the Qwest Stipulation or the Qwest Contracts.

(f)      The Debtors shall timely pay to the Qwest Entities all amounts that accrue under any and all contracts between any of the Debtors and any of the Qwest Entities for telecommunications and related products and services provided to any of the Debtors in the Excluded States (as defined in the Asset Purchase Agreement) or any other states that are not Required States (the "Non-Required States") until the Qwest Entities have discontinued such services in accordance with this Order.

(g)      Within fourteen (14) days after entry of this Order, the Debtors promptly shall seek approval in accordance with applicable law and regulations to discontinue the provision of services and facilities to their end user customers in the Non-Required States.  Upon obtaining regulatory approvals for the discontinuation of such services and facilities, the Debtors shall provide the Qwest Entities with thirty (30) days' advance written notice of the date(s) upon which the Debtors will discontinue the provision of services and facilities to such end user customers in the Non-Required States in accordance with such regulatory approvals obtained by the Debtors (the "Termination Date").  The Debtors shall provide the Qwest Entities with copies of each regulatory approval within five (5) business days after the Debtors' receipt thereof.  The Debtors also shall submit to the Qwest Entities timely ASRs, LSRs, and/or duly authorized

---

[7] Nothing herein shall require the Qwest Entities to refund any pre-Closing Date payment made by the Debtors as a pre-payment for servicing provided by the Qwest Entities on or after the Closing Date.  Any refund or adjustment, if any, for such pre-payments shall be a matter solely between the Debtors and the Buyer.

written requests, as appropriate, for the discontinuation of services contemplated by this sub-paragraph (g).

(h)    In any event, the Debtors are required to discontinue the provision of all services and facilities in the Non-Required States by no later than five (5) business days after the Termination Date (the "Termination Deadline").    Accordingly, as of the Termination Deadline, the Qwest Entities are entitled (in their discretion) to discontinue the provisions of any or all telecommunications and related products and services to the Debtors in the Non-Required States, and to terminate all contracts related to any such services or facilities, without further notice, motion, order or approval of any kind.

(i)    The terms of this paragraph 14 constitute written confirmation by the Qwest Entities of the terms under which they agree to resolve their objection to the Sale Motion and consent to the assignment of the Qwest Contracts.  Approval of the terms of this paragraph 14 does not require further notice or motion.

(j)    This paragraph 14 satisfies the Debtors' obligation under paragraph 9.5 of the Asset Purchase Agreement to obtain the Qwest Entities' written consent to the assignment of the Qwest Contracts.

**Resolution of Objection and Motion of Universal Service Administrative Company**

15.    With the consent of the Debtors, the Buyer, and USAC, the inclusion of this paragraph 15 in this Order shall resolve the USAC Objection and the USAC Motion and such objection and motion shall be deemed resolved.

(a)    Until the Closing Date of the Transactions, the Debtors shall continue to timely submit all Telecommunications Reporting Worksheets, also known as Form 499-Q or Form 499-A, if any such filings become due.

(b)    The Debtors shall be responsible for and shall timely pay any and all obligations to the Universal Service Fund (the "USF") that may arise or accrue prior to or on the Closing Date of the Transactions.

(c)    After the Closing Date of the Transactions, the Buyer shall be responsible for reporting to USAC all revenue derived from or related to the Acquired Assets.

(d)    Within ten (10) business days after the Closing Date of the Transactions, the Debtors shall submit to USAC all documentation required to deactivate the Debtors' USF Filer ID Numbers in order to establish "deactivation dates" as of the Closing Date.

(e)    The Debtors shall comply with the deactivation requirements as set forth on the following page of USAC's website:

http://www.universalservice.org/fund-administration/contributors/deactivation;

(f)    With respect to the annual "true-up" of the Debtors' projected 2011 telecommunications revenue to its actual 2011 telecommunications revenue that shall occur in 2012 (the "2012 True-Up"), the Debtors and/or any successor representative of the Debtors including any Chapter 11 or Chapter 7 trustee shall submit to USAC:

    (i)    the 2012 Annual Telecommunications Reporting Worksheets, also known as the 2012 FCC Form 499-A, when due; and

    (ii)    other information and documentation which USAC may reasonably and customarily require in order to allow USAC to calculate with finality its chapter 11 administrative claim and, if necessary, conduct the 2012 True-Up;

(g)    In the event that the submission of any Annual Revenue Report by or on behalf of the Debtors results in a "net credit" of the Debtors' USF obligations (i.e., a remaining credit corresponding to the post-petition period after full satisfaction of all unpaid USF obligations arising after the Petition Date or a remaining credit

corresponding to the pre-petition period after full satisfaction of all unpaid USF obligations arising prior to the Petition Date) for any revenue period prior to the Closing Date of the Transactions, said credit shall remain the property of the Debtors' estates and the Buyer shall have no rights or claims thereto.

(h)     Nothing herein shall prohibit, limit or restrict USAC's right to file subsequent requests for payment of administrative claims if USAC determines it necessary and the Debtors have reserved all rights to object thereto.

(i)     Nothing in this Sale Order or in connection with the Sale shall prohibit, limit or restrict USAC's rights to (i) audit the Debtors' reported contributor revenues, including with respect to pre-sale and pre-petition periods, (ii) assess and invoice any USF Obligations resulting from any such audit, and (iii) pursue all of USAC's rights related to any such audit including, without limitation, amending previously filed claims against the Debtors.

### Resolution of Objection and Motion of Thermo Credit, LLC

16.     With the consent of the Debtors, the Buyer, and Thermo, the inclusion of this paragraph 16 in this Order shall resolve the Thermo Objection and the Thermo Motion and each shall be deemed withdrawn.

(a)     Debtors shall not disburse, absent further order of the Court upon prior notice, including to Thermo, and an opportunity to be heard, (i) any proceeds from the sale remaining after the payment of allowed payments to the Debtors' providers and other amounts required to be paid in connection with the Closing, and (ii) the proceeds, up to the amount of $3,210,583, from accounts receivable arising prior to the Closing Date (the "Pre-Closing Receivables") (in which Thermo claims an interest which the Debtors

dispute) that are not needed to pay the Debtors' budgeted wind-down and collection expenses.

(b) On or before 60 days from the date of this Order, and in no event less than 14 days prior to Closing, the Debtors, after consultation with Thermo Credit, LLC, shall file with the Court (i) the protocol that will be employed by the Debtors and the Buyer for the "true up" and allocation among them of collections of the Debtors' Pre-Closing Receivables, and (ii) the procedures that will be employed by the Debtors for the continued collection of their pre-closing accounts receivables.

## Additional Provisions

17. On the Closing Date of the Transactions, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Encumbrances with respect to the Acquired Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

18. This Order (a) shall be effective as a determination that, on the Closing Date, all Encumbrances of any kind or nature whatsoever existing with respect to the Debtors or the Acquired Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or

state of title in or to any of such assets or contracts.

19.    Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

20.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Encumbrances with respect to the Acquired Assets shall not have delivered to the Debtors and Buyer prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Encumbrances that the person or entity has with respect to the Debtors, the Acquired Assets or otherwise, then (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such assets and (b) Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances with respect to the Acquired Assets of any kind or nature whatsoever.

21.    All entities that presently are, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to Buyer on the Closing Date.

22.    Except for the Assumed Liabilities, Buyer shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Acquired Assets.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the Purchase Agreement, Buyer shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and Buyer shall have no successor or

vicarious liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, (a) liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Business prior to the Closing Date and (b) liabilities based on any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity.

23.    Under no circumstances shall Buyer be deemed a successor of or to the Debtors for any Encumbrance against or in the Debtors or the Acquired Assets of any kind or nature whatsoever.  Except for the Assumed Liabilities, the sale, transfer, assignment and delivery of the Acquired Assets shall not be subject to any Encumbrances, and Encumbrances of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtors.  Except for persons holding Assumed Liabilities, all persons holding Encumbrances against or in the Debtors or the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Encumbrances of any kind or nature whatsoever against Buyer, its property, its successors and assigns, or the Acquired Assets, as an alleged successor or otherwise, with respect to any Encumbrance of any kind or nature whatsoever such person or entity had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Acquired Assets. Following the Closing Date, no holder of an Encumbrance with respect to the Debtors shall interfere with Buyer's title to or use and enjoyment of the Acquired Assets based on or related to such Encumbrance, or any actions that the Debtors may take in their chapter 11 cases.

24.     Any amounts that become payable by the Debtors pursuant to the Purchase Agreement or any of the documents delivered by the Debtors pursuant to or in connection with the Purchase Agreement shall (a) be paid by the Debtors in the time and manner as provided in the Purchase Agreement, without further order of this Court and (b) not be discharged, modified, or otherwise affected by any plan of reorganization or liquidation for the Debtors.

25.     This Court retains exclusive jurisdiction over any matter or dispute arising from or relating to the implementation of this Order as well as to enforce and implement the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining exclusive jurisdiction to (a) compel delivery of the Acquired Assets to Buyer, (b) resolve any disputes arising under or related to the Purchase Agreement, except as otherwise provided therein, (c) interpret, implement, and enforce the provisions of this Order, and (d) protect Buyer against any Encumbrances with respect to the Debtors or the Acquired Assets, of any kind or nature whatsoever, attaching to the proceeds of the Transactions.

26.     Nothing contained in any plan confirmed in these cases or any order of this Court confirming such plan shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Order.

27.     The transactions contemplated by the Purchase Agreement are undertaken by Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions as to Buyer, except to the extent such authorization is duly stayed pending such appeal prior to such consummation.

Buyer is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

28.     The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, Buyer, and its affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties including, but not limited to, all persons asserting Encumbrances with respect to such assets to be sold to Buyer pursuant to the Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s) or similar  party under any chapter of the Bankruptcy Code, as to which trustee(s) or similar party such terms and provisions likewise shall be binding.

29.     The failure specifically to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

30.     The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by all parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates or their creditors.

31.     Notwithstanding any other provision of this Order or any other Order of this Court, no assignment of any rights and interests of the Debtors in any federal license or authorization issued by the Federal Communications Commission (FCC) shall take place prior to the issuance of FCC regulatory approval for such assignment pursuant to the Communications

Act of 1934, as amended, and the rules and regulations promulgated thereunder. The FCC's rights and powers to take any action pursuant to its regulatory authority, including, but not limited to, imposing any regulatory conditions on such assignments and setting any regulatory fines or forfeitures, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law. All of the Buyer's rights are fully preserved with respect to any exercise of power or authority by the FCC with respect to the Transactions approved and authorized by this Order.

32. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062 and 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and the Debtors and Buyer are authorized to close the Transactions immediately upon entry of this Order.

**DONE** and **ORDERED** in Orlando, Florida on July 14, 2011.

_____
Karen S. Jennemann
United States Bankruptcy Judge

Copies to:

Scott L. Baena, Esq.
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, Suite 2300
Miami, FL 33131

Local Rule 1007 List